[No. 7208–8–III.   Division Three.   December 30, 1986.]

LESTER W. ROY, ET AL, *Respondents,* v. SANFORD M. CUNNINGHAM, ET AL, *Appellants,* THEODORE A. ROY, ET AL, *Respondents.*

*F. Joseph Falk, Jr., Walters, Whitaker, Finney & Falk, Charles C. Flower, Patrick M. Andreotti,* and *Flower & Andreotti,* for appellants.

*Ted A. Roy,* pro se, *Reed C. Pell,* and *Roy & Pell,* for respondents.

THOMPSON, J.—The Cunninghams, Meyerses and trustee Allen Israel appeal the trial court judgment quieting title in the Roys to a disputed strip of property along a fence line in Yakima County. We affirm in part and remand for a

redetermination of damages.

In 1977, the Roys[1] were contract purchasers of property, the eastern boundary of which, they believed, ran along a north–south fence line. In August 1980, Robert Meyers removed the old fence and constructed a new one approximately 47 to 52 feet to the west. The new fence line ran along the actual property boundary between the Roys' land on the west, and a series of four parcels on the east owned by Robert and Sandra Meyers (lots 3 and 4) and trustee Allen D. Israel (lot 1). Lot 2 was being purchased by Earnest and Helen Cunningham on a real estate contract.

After September 15, 1982, the Cunninghams,[2] contract purchasers of property to the north of the other four parcels, also removed the old fence and reconstructed a new fence along the actual boundary between their property and the Roys' to the west. The Roys brought suit to quiet title to the disputed property between both fence lines, and by judgment dated June 21, 1985, title was confirmed in them by adverse possession. They were also awarded costs and $1,700 in damages. The Meyerses' counterclaim for tortious interference with a business expectancy and third party complaint for improper institution of legal process were dismissed. All parties except the Roys appeal.

■ We are first asked to consider whether a presumption of permissive use arises where a fence is used to contain livestock. Permission to occupy the land, given by the true title owner to the claimant or his predecessors in interest, will operate to negate the element of hostility in an adverse possession claim. *Chaplin v. Sanders,* 100 Wn.2d 853, 861–62, 676 P.2d 431 (1984). The Cunninghams cite *Hawk v. Walthew,* 184 Wash. 673, 52 P.2d 1258 (1935) for the proposition that where testimony establishes the original purpose of a fence was pasturage, the use will be

---

[1]Included are the marital communities of Lester and Emma Roy, and Theodore and Patricia Roy.

[2]Included are the marital communities of Bradley and Cheryl Cunningham, and Sanford and Mary Cunningham.

deemed permissive. Although *Hawk* was not expressly overruled by *Chaplin,* it had already been arguably limited. Notably, *Taylor v. Talmadge,* 45 Wn.2d 144, 149, 273 P.2d 506 (1954), *overruled on other grounds in Chaplin v. Sanders, supra* at 861 n.2, ruled the building of a pasture fence on disputed land "would not militate against an adverse holding" if the use of the land was incident to a claim of right. *Taylor* framed the question as "whether a property fence is maintained as a matter of convenience, or under a claim of ownership". The nature of the actual use, rather than the original purpose for constructing the fence is controlling. Therefore, in instances such as this, particularly where the original purpose for the fence is unknown, no presumption of permission arises.

The next and major issue is whether express declarations of a prior owner that he does not know exactly where his boundary line is with regard to the disputed land will negate the "hostility/claim of right" element of adverse possession. The main purpose of the adverse possession doctrine is to assure maximum utilization of the land, encourage the rejection of stale claims, and quiet titles. *Chaplin,* at 860 (citing 7 R. Powell, *Real Property* ¶ 1012[3] (1982)). The elements of adverse possession include possession which is (1) exclusive, (2) actual and uninterrupted, (3) open and notorious, and (4) hostile and under a claim of right made in good faith. *Chaplin,* at 857. These elements must exist concurrently for 10 years. RCW 4.16.020; *Chaplin,* at 857. The hostility/claim of right element requires only that the claimant "treat the land as his own as against the world throughout the statutory period". *Chaplin,* at 860–61. The claimants' subjective belief and intent to dispossess or not dispossess another are not relevant to this determination. *Chaplin,* at 861.

Here, the trial court ruled that, although the original purpose for constructing the fence was unknown, for at least 20 years prior to its removal the fence represented and was used as a "well marked and defined boundary between the real property lying west and east of said fence". Testi-

mony at trial indicated a difference of opinion by certain prior owners as to their understanding of the purpose of the fence. The Meyerses, et al, argue that statements made by a prior owner, Willis Mondor, to the Roys' immediate predecessor, Don Agnew, establish objective indicia of the use of the land. Specifically, Mr. Mondor testified that, prior to the 1974 sale to Mr. Agnew, he had a southern portion of the property surveyed; he knew the fence was beyond his actual eastern boundary line; he informed Mr. Agnew of these facts; and told Mr. Agnew "that [Mr. Mondor] was selling him according [to] the legal description. That the land was there someplace. If it was inside the fence, all right, and if it wasn't, it was up to him to get it". Mr. Mondor testified he owned the property for at least 14 to 16 years prior to the sale to Mr. Agnew and he used the entire area up to the fence for grazing purposes.

We note reference in *Chaplin,* at 862, to the relevance of the *objective* character of the possession. But we also note *Chaplin* rejected the distinction between *acts* and *declarations* formerly set forth in *O'Brien v. Schultz,* 45 Wn.2d 769, 780, 278 P.2d 322 (1954); *see* Survey of Washington Law, *Property Law: Adverse Possession,* 19 Gonz. L. Rev. 777 (1984). Notwithstanding the argument Mr. Mondor's conversations established the objective use of the property, the evidence indicates Mr. Mondor and his successors treated the land up to the fence as their own as against the world. That essential fact was correctly determined by the trial court, and we conclude Mr. Mondor's statements were merely expressions of irrelevant subjective beliefs.

The next issue is whether the Roys may tack adverse use of the property by their predecessors in interest, Agnew and Mondor, in order to satisfy the element of 10 years' adverse possession. Where there is privity between successive occupants holding continuously and adversely to the true title holder, the successive periods of occupation may be tacked to each other to compute the required 10–year period of adverse holding. RCW 4.16.020; *El Cerrito, Inc. v.*

*Ryndak,* 60 Wn.2d 847, 856, 376 P.2d 528 (1962) (citing *Buchanan v. Cassell,* 53 Wn.2d 611, 335 P.2d 600 (1959)).

The Meyerses, et al, quote the following language from *Buchanan,* at 614:

This state follows the rule that a purchaser may tack the adverse use of its predecessor in interest to that of his own where the land *was intended to be included* in the deed between them, but was mistakenly omitted from the description.

(Italics ours.) They argue privity does not exist under these facts since Mr. Mondor did not intend to convey any interest in the disputed property. His only intent, as stated, was to convey the property described in the Mondor–Agnew contract.

The doctrine of privity has been broadly construed to be the "judicial recognition of the need for some reasonable connection between successive occupants of real property so as to raise their claim of right above the status of the wrongdoer or the trespasser". *Howard v. Kunto,* 3 Wn. App. 393, 400, 477 P.2d 210 (1970), *overruled on other grounds in Chaplin v. Sanders, supra* at 861 n.2. Just as intent of the adverse possessor is irrelevant to the determination of the element of hostility, it likewise will not bar the application of privity to successors through documentary conveyances. This is particularly true in light of the rule allowing tacking when an adversely possessed strip is physically "turned over" in connection with the conveyance of adjoining land the possessor owns. *See* R. Cunningham, W. Stoebuck & D. Whitman, *Property* § 11.7 (1984). The fact reference to the disputed land was omitted from the contract, but not "mistakenly", will not defeat the Roys' tacking of their predecessors' periods of valid adverse possession.

The next issue is whether the Roys are estopped from asserting their claim 3 years after originally threatening suit. After the Meyerses reconstructed the fence on the true boundary line in 1980, Ted Roy wrote to them demanding that the fence be replaced to its original location within 10

days or quiet title proceedings would be initiated. The fence was not returned to its previous location and suit was not brought by the Roys until November 1983. In the interim period, the Meyerses contend that in reliance on failure to initiate suit at the end of the 10–day period they improved two of the four lots and conveyed the other two by legal description warranting title.

A boundary by estoppel arises when one owner erroneously represents to the other that their common boundary is along a certain line; and the second owner, in reliance, builds encroaching improvements or takes other detrimental action. The party making the representations is estopped to deny them and the boundary is in effect shifted accordingly. R. Cunningham, W. Stoebuck & D. Whitman, at 770.

The party seeking to establish equitable estoppel must prove the following by clear, cogent and convincing evidence: (1) an admission, statement, or act inconsistent with the claim afterward asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury resulting from allowing the first party to contradict or repudiate. *Arnold v. Meláni,* 75 Wn.2d 143, 147, 437 P.2d 908, 449 P.2d 800, 450 P.2d 815 (1968); *Magart v. Fierce,* 35 Wn. App. 264, 267, 666 P.2d 386 (1983); *Fralick v. Clark Cy.,* 22 Wn. App. 156, 161, 589 P.2d 273 (1978); *Burkey v. Baker,* 6 Wn. App. 243, 248, 492 P.2d 563 (1971). Additionally, the party claiming estoppel must have a right to rely upon the acts or representations, and must have been misled. *Magart,* at 267–68; *Burkey,* at 248.

Here, the Meyerses contend the Roys' failure to immediately initiate suit at the end of the 10–day period amounted to a representation of abandonment of their claim. The relevant language in the Roy letter read:

> As we advised you, we do not intend to acquiesce in such conduct and accordingly unless the fence is replaced to its original location within ten (10) days we intend to initiate the necessary legal proceedings to quiet title to

the property in question and for damages. We hope that will not be necessary.

■ It can reasonably be concluded the Roys did not deem a lawsuit necessary until after September 1982 when the Cunninghams, who were purchasing the northernmost parcel on contract, also moved their fence to the true boundary line. Bearing in mind the period of time during which a person may legally bring a lawsuit after a cause of action arises regarding real property, failure to sue immediately after an assertion of a possessory interest in land does not amount to a representation that a claim has been abandoned. Moreover, the Meyerses' subsequent improvements and conveyances despite actual notice of the Roys' claim were undertaken without the requisite "right to rely". Estoppel was therefore not established.

■ We next consider whether the trial court erred in dismissing the Meyerses' claim for tortious interference with business expectancies. The elements of a tortious interference claim include:

> (1) existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy by the alleged interfering party; (3) intentional interference inducing or causing breach or termination of the relationship or expectancy; and (4) resultant damage.

*Sea–Pac Co. v. United Food & Comm'l Workers, Local 44,* 103 Wn.2d 800, 805, 699 P.2d 217 (1985) (citing *Calbom v. Knudtzon,* 65 Wn.2d 157, 162–63, 396 P.2d 148 (1964)). Even if a prima facie case is made, one who in good faith asserts a legally protected interest of his own that he believes may be impaired by the performance of a contract between others is not guilty of tortious interference. *Dauphin v. Smith,* 42 Wn. App. 491, 495, 713 P.2d 116 (1986).

Robert Meyers testified that after he replaced the fence, Ted and Les Roy voiced their disapproval, threatening to bring suit as well as "cause problems" with Mr. Meyers' plans to convey his business property. However, given the possessory claim asserted by the Roys in the disputed

property being conveyed, the trial court properly dismissed the claim for tortious interference.

Because the parties agree the legal description utilized by the trial court must be changed since it included property not at issue, we remand for a redetermination of damages consistent with the amended property description. All other issues are affirmed.

McINTURFF, A.C.J., and YENCOPAL, J. Pro Tem., concur.

Reconsideration denied March 2, 1987.

Review denied by Supreme Court June 2, 1987.